UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
ANDRE GREEN,                       )
                                   )
      Petitioner,                  )
                                   )
      v.                           )  Civil Action No. 14-cv-12589-DJC
                                   )
SEAN MEDEIROS,                     )
                                   )
      Respondent.                  )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**          September 18, 2017

## I.    Introduction

Petitioner Andre Green ("Green") filed a petition for a writ of habeas corpus ("Petition") pursuant to 28 U.S.C. § 2254 based on seven grounds, alleging that his trial and conviction for first-degree murder violated his constitutional rights. D. 1. For the foregoing reasons, the Court DENIES the Petition.

## II.    Factual and Procedural Background

### A.    Factual Background

The following facts are drawn from the decision of the Supreme Judicial Court denying Green's appeal. On February 5, 2003, there was a shooting on a subway train in Boston. Commonwealth v. Akara, 465 Mass. 245, 246 (2013). The intended victim of the shooting was Philip Gadsden, but one bullet struck Hawa Barry ("Barry") in the abdomen. Id. Barry was thirty-six weeks pregnant at the time; her baby was delivered alive but died shortly thereafter from injuries sustained from the shooting. Id.

Earlier that evening, Green, Chimezie Akara ("Akara"), Sean Brown ("Brown"), and Burrell Ramsey-White ("Ramsey-White") had congregated at the Forest Hills subway station. Id. at 248. The four were members of a "small and loosely-organized gang" known as Tent City. Id. They wrote "Tent City" and "TC" in green marker on a sign at the Forest Hills subway station. Id. At around 7:40 p.m. or 7:50 p.m., the four of them boarded a train. Id. Gadsden boarded the train at the same time and sat near to where the four were standing. Id. While the train was passing between stops, there was a heated exchange between Gadsden and Akara and Green. Id. at 249. Either Akara or Green drew a weapon on Gadsden and Gadsden began to move away from them and shouted that they have a gun. Id. At least two shots were fired. Id. at 250. Akara, Green, Brown and Ramsey-White ran off the train car and were heard "laughing or chuckling in a congratulatory manner." Id. One of the bullets had struck Barry, who began bleeding profusely. Id. Gadsden and other passengers assisted her in getting off the train and waiting for emergency services. Id. The other bullet lodged in the guitar case of another passenger and was later turned over to the police. Id. The gun that fired the two shots was identified as a nine millimeter Desert Eagle semiautomatic handgun. Id. at 251.

At around 8:15 p.m., Akara and Green went to the apartment where Green lived. Id. Akara displayed a nine millimeter Desert Eagle semiautomatic handgun to Green's cousin. Id. After some time, Akara and Green left that apartment and Green went to the apartment of his then-girlfriend, Sheen Sanford ("Sanford"), while Akara went to the house of Kalif Christopher ("Christopher"). Over the course of that night, Akara and Green spoke to each other on the phone four times. Id. In one of these calls, Sanford answered when Akara called Green and Akara asked Sanford, "Did I get away with it?" Id. In the subsequent days, both Akara and Green instructed Green's cousin not to speak to the police. Id. at 252.

During the investigation, Barry described the shooter as a person matching Green's description and picked Green out of a photographic array. Id. Gadsden, however, told police that the person holding the gun was wearing clothes that matched what Akara was wearing. Id. at 249 n. 5. Gadsden later testified to the grand jury that he could not recall which defendant was holding the gun. Id.

## B. Procedural Background

A grand jury indicted both Akara and Green for first-degree murder. Id. at 246. Akara and Green moved to sever their trials from each other, contending that their defenses were "mutually antagonistic and irreconcilable." Id. at 256. These motions were denied. "The Commonwealth's theory at trial was that the shootings had been committed as part of a joint venture in which one of the defendants had fired the gun intending to shoot Gadsden, and the other had acted as the joint venturer in the commission of the crime." Id. at 247. The Commonwealth "presented two alternative and mutually exclusive versions of events": that either Akara or Green was the shooter. Id. at 439.

At trial, Sanford testified that, on the night in question, when Akara called Green, Akara had asked Sanford whether "they [were] going to get away with it." Id. at 266. The use of the word "they" conflicted with her statements to the grand jury, which indicated that Akara had asked Sanford "Did I get away with it?" Id. This was pointed out during her cross-examination and Sanford then corrected her testimony, consistent with her statements to the grand jury. Id.

The Commonwealth's expert, John M. Brown of the Boston Police Department, testified, over the defendants' objection, that Tent City was a gang, which he defined as any "group, organization, or association of four or more people, usually under the age of [twenty-five]," who "call themselves by a group name and various common identifying signs, symbols or clothing

3

items." Id. "Other than a brief mention of vandalism, [the expert] did not discuss any criminal activity by Tent City or other similarly-structured groups." Id. at 267. There was no evidence presented at trial that the motivation for the shooting had been gang-related. Id.

At the close of evidence, both Akara and Green moved for a finding of not guilty, contending that the Commonwealth had not put forward sufficient evidence to support a finding of a joint venture. Id. at 247. The trial court denied these motions. Id. During closing arguments, the prosecutor argued that the jury could find a joint venture because the "Boston police, the District Attorney's office, and the Suffolk Grand Jury had heard sufficient evidence to charge not one, but two people." Id. at 262. As part of the final jury charge "following shortly after closing argument," the judge explained to the jury that "[t]he fact that somebody is indicted of a crime is not evidence that they committed a crime and should not be considered for that purpose." Id.

Given the alternative theories presented by the Commonwealth, the defendants requested a jury instruction stating that "if the jury could not determine who acted as principal and who as a joint venturer, [the jury] had to find beyond a reasonable doubt that a joint venture existed." Id. at 258. The court declined to give the requested instruction. Instead, the court charged that jury that, to find the defendants guilty on the basis of joint venture, "the Commonwealth must prove [the elements of joint venture] beyond a reasonable doubt." Id. (alteration in original).

The jury convicted both Akara and Green of first-degree murder. Id. at 247. On appeal before the Supreme Judicial Court, Green challenged several rulings of the trial court, including its decision to deny the motion for a directed verdict; its decision not to sever his trial from Akara's trial; its decision to admit Sanford's statement regarding what Akara had said in the phone call; its decision to admit the expert testimony on gangs; its decision not to declare a mistrial after the

prosecutor's remarks in the closing argument regarding the indictments; and the jury instructions. Id. That appeal was denied. Id.

### C. Green's Grounds for Relief

In the Petition, Green raises six grounds for relief: 1) that the Commonwealth did not present sufficient evidence to convict Green under the theory that Akara fired the gun and Green was an accomplice and joint venturer in the crime; 2) that the denial of Green's motion to sever his trial from Akara's trial violated Green's constitutional rights to due process and a fair trial; 3) that a particular jury instruction given by the trial court violated Green's constitutional right to due process; 4) that the prosecution's reference to the indictments in closing argument violated Green's constitutional right to due process; 5) that the testimony of Sanford violated Green's constitutional right to confront the witnesses against him; and 6) that the introduction of evidence related to Green's membership in a gang violated Green's constitutional rights to due process and a fair trial.

## III. Review of Habeas Petitions

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Green is entitled to relief on the Petition only if he can show that any claim adjudicated in the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Clarke v. Spencer, 582 F.3d 135, 140 (1st Cir. 2009). Clearly established federal law only includes holdings—not dicta—of United States Supreme Court decisions. White v. Woodall, __U.S. __, 134 S. Ct. 1697, 1702 (2014). A state court decision is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at an opposite result. Williams v. Taylor, 529 U.S. 362, 405 (2000). This standard is "'difficult to meet' because the purpose of AEDPA is to ensure that federal habeas

relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." Greene v. Fisher, 565 U.S. 34, 43 (2011) (citations omitted).

A state court decision involves an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407; see McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (explaining that the Supreme Court has noted that "unreasonableness is difficult to define" but that a state court decision can be deemed unreasonable if it is "devoid of record support" or if its conclusions are "arbitrary"). Because the statute "uses the word 'unreasonable,' as opposed to 'erroneous' or 'incorrect,' a state court's application of federal law must go beyond simple error to justify issuance of the writ of habeas corpus." Morgan v. Dickhaut, 677 F.3d 39, 46 (1st Cir. 2012) (citing Williams, 529 U.S. at 411). The application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." White, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

**IV.    Discussion**

  **A.    <u>Sufficiency of the Evidence</u>**

Green argued to the Supreme Judicial Court that the Commonwealth did not put forward sufficient evidence of the existence of a joint venture to convict Green under the theory that he was a joint venturer with Akara, who fired the gun. The Supreme Judicial Court rejected this contention, based on the following facts: Green was standing by Akara at the time of the shooting;

6

Green and Akara were exchanging glances shortly before the shooting; Green fled with Akara, as the two were laughing and chuckling; and Akara and Green's cooperation in attempting to avoid being apprehended. Akara, 465 Mass. at 255. Green now contends that the Supreme Judicial Court erred in concluding that those facts amounted to sufficient evidence for the joint venture theory. But, Green concedes, however, that there was evidence to convict him under the theory that he was the shooter, due to Barry's identification of him. D. 47 at 3.

Even if Green were correct that there was not sufficient evidence of a joint venture, he is not entitled to relief because he concedes that there was sufficient evidence to convict him on the theory that he was the shooter. "On a federal habeas review of a state-court conviction that potentially rests on dual theories of guilt, the writ will not issue as long as one of the two theories is adequately supported." Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008). In Leftwich, the Commonwealth similarly prosecuted the defendant on alternative theories that he was either a principal or joint venturer in a murder and the jury returned a verdict of guilty without specifying which theory formed the basis for its verdict. Id. at 22. The First Circuit affirmed the district court's dismissal of the defendant's later habeas petition, by affirming the district court's finding that there was sufficient evidence as to one theory, without adjudicating the sufficiency of the evidence as to the alternate theory. Id. at 24. The First Circuit explained that "[b]ecause that theory [under which the defendant was the principal] is adequately supported . . . our analysis ends there." Id. at 24 n.3; see Brown v. Maloney, 267 F.3d 36, 44 (1st Cir. 2001) (noting that "[u]nder federal constitutional law, in contrast to Massachusetts law, Brown has no right to a new trial as a remedy where his claim is that there was insufficient evidence to support one theory of conviction on the count but concedes that there was sufficient evidence as to the other theory") Thus, because there was sufficient evidence on the theory under which he was the shooter, any insufficiency of

7

the evidence on the alternative theory under which Green was the joint venturer does not entitle him to relief.

**B.      Severance of Trial**

The Supreme Judicial Court rejected Green's claim regarding the denial of the motion to sever his trial from Akara's, reasoning that that there was sufficient independent evidence of guilt such that a separate trial was not required. Akara, 465 Mass. at 257. Green now contends that the Supreme Judicial Court's decision was contrary to both the Massachusetts standard and the federal standard for determining when a defendant is entitled to severance of trial. D. 47 at 12-14. In support of this claim, he cites both to Commonwealth v. Moran, 387 Mass. 644, 659 (1982) (finding severance required where the Commonwealth "introduced convincing evidence that at least one defendant, but not necessarily both of them, robbed and willed Wronski") and Zafiro v. United States, 506 U.S. 534, 539 (1993).

Any error of the Supreme Judicial Court in failing to abide by Massachusetts standards for severance is not cognizable on habeas review. Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) ("the question of whether anything at trial violated state law in a non-death-penalty case is no part of a federal habeas court's review of a state conviction"). As for the federal standard set out in Zafiro, the Supreme Court laid out that standard by interpreting Rule 14 of the Federal Rules of Criminal Procedure, with no indication that there is any constitutionally required right to severance. Zafiro, 506 U.S. at 539; see Collins v. Runnels, 603 F.3d 1127, 1131-32 (9th Cir. 2010) (ruling that the Zafiro standard is not binding on state courts). But, even assuming that the Zafiro standard is applicable to his claim, Green has failed to state a claim that he would have been entitled to severance under Zafiro. As Zafiro explained:

> Mutually antagonistic defenses are not prejudicial *per se*. . . . [W]hen defendants properly have been joined under Rule 8(b), a district

8

court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. . . . Turning to the facts of this case, we note that petitioners do not articulate any specific instances of prejudice. Instead they contend that the very nature of their defenses, without more, prejudiced them. Their theory is that when two defendants both claim they are innocent and each accuses the other of the crime, a jury will conclude (1) that both defendants are lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt.

Zafiro, 506 U.S. at 538-40. The Court went on to reject that theory, stating that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Id. at 540.

Here, the only evidence of prejudice that Green offers is to claim that the defenses offered by him and Akara were mutually conflicting and irreconcilable. D. 47 at 11-13. Thus, like the defendants in Zafiro, he has not shown that he was entitled to severance of trial from Akara.

### C. Jury Instruction

Green also argued to the Supreme Judicial Court that the trial court erred in failing to accept a proposed jury instruction. The trial court had instructed the jury that the Commonwealth need not prove which defendant was the principal and which defendant was only the joint venturer to convict both defendants. Akara, 465 Mass. at 258. Green had at that point requested an instruction that, if they could not determine who was the principal and who was only a joint venturer, the jury had to find the existence of a joint venture beyond a reasonable doubt to convict either defendant. Id. The trial court declined to accept the proposed instruction. Id. Rather, the trial court instructed the jury that to find the defendants guilty on a theory of joint venture, the Commonwealth had to

9

prove the elements of joint venture beyond a reasonable doubt. Id. The trial court then "gave a detailed and accurate instruction on joint venture, accompanied by a printed handout listing the required elements and reiterating that each element must be found beyond a reasonable doubt." Id. The Supreme Judicial Court thus concluded that the instruction, in its entirety, was "correct," and that the judge was "not required to give an instruction exactly as requested by the defendant." Id.

Green now contends that the Supreme Judicial Court erred in rejecting his claim because the trial court's statement that the Commonwealth need not prove which defendant was the principal, without the proposed clarifying instruction suggested by Green, gave the jury an inaccurate impression of the law and thus denied Green his due process rights. D. 47 at 15. But Green, however, does not appear to challenge the Supreme Judicial Court's ruling that the jury instruction read as a whole did correctly instruct the jury that, to convict both defendants without determining who the principal was, it had to find the elements of a joint venture beyond a reasonable doubt. See Waddington v. Sarausad, 555 U.S. 179, 191 (2009) (the jury instruction cannot be judged in isolation but "must be considered in the context of the instructions as a whole and the trial record") (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). Thus, Green has failed to show that he is entitled to relief on this ground.

### D. Prosecutor's Closing Argument

Green argued to the Supreme Judicial Court that the prosecutor's statement in closing argument that "the Boston Police, the District Attorney's Office, and the Suffolk County Grand Jury had heard sufficient evidence to charge not one, but two people" constituted grounds for a mistrial. The Supreme Judicial Court rejected this argument on the ground that the instruction by the judge, "following shortly after closing argument and responding to the prosecutor's improper

10

argument," sufficiently mitigated the error such that the improper remark "could not have made a difference in the jury's conclusions." Akara, 465 Mass. at 262. Green now contends that the Supreme Judicial Court erred in coming to that conclusion, in violation of his constitutional right to a fair trial. D. 47 at 21.

A prosecutor's "improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). In assessing whether an improper remark rises to that level, it is necessary to take into account "the seriousness of the improper remark, the context in which the statement was made, the court's response or curative instructions, and the effect of the statement on the overall proceeding." Dagley v. Russo, 540 F.3d 8, 17 (1st Cir. 2008). In Dagley, the First Circuit held that a Supreme Judicial Court decision affirming a conviction where a prosecutor made a stray improper remark that was followed by a curative instruction was not an unreasonable application of federal law. Id. at 17-18. The Supreme Judicial Court in that case had found that in the context of the proceedings as a whole, the improper remark could not have made a difference to the jury's verdict. Id. at 15-16. The First Circuit determined that this reasoning was not contrary to federal law because it followed the approach by the Supreme Court laid out in Donnelly v. DeChristoforo, 416 U.S. 637 (1974). Dagley, 540 F.3d at 17 (quoting Donnelly, 416 U.S. at 645).

Similar to the Supreme Judicial Court's decision under review in Dagley, the Supreme Judicial Court here reasoned that the curative instruction sufficiently mitigated the error such that the improper remark would not affect the jury's verdict and therefore would not compromise Green's constitutional rights. In arguing that the Supreme Judicial Court erred in so reasoning, Green only cites Commonwealth v. McLeod, 30 Mass. App. Ct. 536, 540 (1991). D. 47 at 21. But

11

that case presents facts quite different from this one because, in McLeod, the judge did not issue a curative instruction but merely recited the "boilerplate charge." Id. In contrast, the judge here promptly issued an instruction mitigating the error. Green offers no other argument for why the improper remark, followed by a curative instruction, rises to the level of infecting the trial with unfairness. Thus, Green has not met his burden of showing that the Supreme Judicial Court unreasonably applied clearly established federal law in rejecting his claim.

### E. Sanford's Testimony

Green argued to the Supreme Judicial Court that the testimony by Sanford constituted a violation of his constitutional rights because it introduced an incriminating statement by his co-defendant, Akara, whom Green was not permitted to cross-examine. See Bruton v. United States, 391 U.S. 123 (1968) (holding that a mistrial was required where the jury was exposed to incriminating statements by a co-defendant whom the defendant could not cross-examine, notwithstanding a limiting instruction). The Supreme Judicial Court rejected this claim, reasoning that Sanford's statement was not incriminating as to Green because Sanford corrected her description of Akara's statement from whether "they [were] going to get away with it" to "Did I [Akara] get away with it?" Akara, 465 Mass. at 266. Green now contends that the Supreme Judicial Court erred in reaching this conclusion, because after that correction was issued, the trial court judge removed the restriction that Sanford's statement could only be considered by the jury for the purposes of evaluating Akara's guilt. D. 47 at 23-24. But, Green does not contest the Supreme Judicial Court's conclusion that the corrected statement was not incriminating against Green. Thus, if the corrected statement was not incriminating against Green, it is not relevant whether the limiting instruction on Sanford's statement was removed. See Richardson v. Marsh, 481 U.S. 200, 208 (1987) (holding that Bruton does not apply to statements that do not expressly

implicate the defendant). Green has, therefore, failed to meet his burden of showing that he is entitled to relief on this claim.

### F. Gang Evidence

Green argued to the Supreme Judicial Court that the trial court erred in allowing the introduction of expert testimony regarding Green's membership in the gang. The Supreme Judicial Court rejected Green's challenge to the admission of the expert testimony. It reasoned that the expert testimony was admitted "for the limited purpose of showing motive and joint venture," and was relevant to that purpose because it "supplied additional evidence of the defendants' relationship." Akara, 465 Mass. at 268. There was no evidence presented that the "motive for the shootings was gang-related," or that "Gadsden was affiliated with Tent City or any rival group," or that there were any "previous interactions between Gadsden . . . and any other members of Tent City, prior to the day of the shooting." Id. at 267. The Supreme Judicial Court added that the expert testimony was not "improper propensity evidence" because "[t]he prosecutor did not suggest that the gang or its members had a history of violence, or that their affiliation made either man more likely to participate in violent crimes." Id. at 268. Green now contends that the Supreme Judicial Court erred in affirming the trial court's decision to admit that evidence, because the evidence constituted "irrelevant bad character evidence" that deprived Green of his constitutional right to a fair trial. D. 47 at 24.

"To be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible." Abrante v. St Amand, 595 F.3d 11, 19 (1st Cir. 2010) (citation omitted). In arguing that the admission of the expert testimony rises to that level, Green points to the fact that the prosecutor referenced Green's gang membership multiple times in his opening statement and closing argument. D. 47 at 27. But, Green provides

no reason to conclude that the references made to Green's gang membership were "inflammatory" in light of the fact that these references did not purport to establish that the gang was violent or otherwise criminal. Rather, a "gang" was defined in the expert testimony as only a "group, organization, or association of four or more people, usually under the age of [twenty-five]," who "call themselves by a group name and various common identifying signs, symbols or clothing items." Akara, 465 Mass. at 266. Under that definition, references to gang membership are not necessarily inflammatory in the absence of other prejudicial information about the gang (which was not present here). Nor does Green point to any Supreme Court decision that was contrary to the Supreme Judicial Court's decision to admit the expert testimony, or of which the Supreme Judicial Court's decision would constituted an unreasonable application. Thus, Green has not met his burden of showing that he is entitled to relief on this claim.[1]

## V. Certificate of Appealability

To be granted a certificate of appealability to seek further review of his case, Green must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). That is, he must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000); Bly v. St. Amand, 9 F. Supp. 3d 137, 164-65 (D. Mass. 2014). At this time, given the Court's analysis of the factual record in this case and the applicable law, the Court does not believe reasonable jurists could differ as to how Green's Petition

---

[1] Green also argues that he meets the "fundamental miscarriage of justice" standard because he has provided sufficient evidence of actual innocence. D. 47 at 27-28. The "fundamental miscarriage of justice" standard is used in determining whether a federal court should overlook a habeas petitioner's procedural default of a claim where the petitioner cannot otherwise show good cause for the procedural default. See Coleman v. Thompson, 501 U.S. 722, 748 (1991). Because the Supreme Judicial Court adjudicated all of Green's claims on the merits, rather than on the basis of any procedural default, the fundamental miscarriage of justice standard is not applicable here.

should have been resolved. The Court is, therefore, not inclined to issue a certificate of appealability but will give Green until October 9, 2017 to file a memorandum, not exceeding five pages, to address whether a certificate of appealability is warranted in his case. Pursuant to Rule 11(a) governing § 2254 proceedings, if Green does not file such a memorandum prior to that date the Court will subsequently issue a notice of denial of his certificate of appealability.

## VI. Conclusion

For all of the foregoing reasons, the Court DENIES Green's petition for writ of habeas corpus, D. 1.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge